[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 724 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 725 
 OPINION
Distinguishing between friends and enemies can sometimes be more problematic than would be expected. Douglas George Schmitz was convicted of four misdemeanors, based on a search premised on the parolee status of a passenger in his car. He must have had difficulty figuring out in which column — friends or enemies — he should list that passenger.[1]
Douglas George Schmitz appeals after pleading guilty to four misdemeanors. His guilty plea came after the court denied his motion to suppress evidence found on the floor in the rear passenger area of his car. The evidence was discovered during a search predicated on the parolee status of the passenger riding in the vehicle's front seat, and Schmitz argues the parolee status of a front seat passenger does not validate a warrantless search of the backseat area, as the parolee sitting in the front passenger seat cannot be viewed as having "joint access and control" over that backseat area. We agree. A mere passenger in a vehicle, who claims neither a possessory nor property interest therein, lacks the "common authority" over the vehicle which would allow him either to consent or object to its search. Consequently, the parole status of such a passenger cannot be relied upon as the sole basis to justify such a search. The judgment is reversed.
 FACTS[2]
Deputy Sheriff Mihela Mihai testified that about 7:00 p.m. on November 24, 2006, she observed an older model Oldsmobile or Buick turn off a main *Page 726 
street into a smaller street which was lined on both sides by the garages of a condominium complex. She thought the driver might be lost, and pulled into the street after him. She saw the car make a U-turn in the small street, and proceed back toward the main street. As the car was nearing her vehicle, she stopped, and the other car then stopped parallel to hers.
There were three adults and a small child in the other car. The deputy asked the driver, Schmitz, if he was lost. He responded that he was not, and explained he had simply pulled into the street with the intention of making the U-turn, as he did not believe he could do so on the main street. The deputy then parked her car and got out. According to the deputy, Schmitz's car was not obstructed by hers, and he was free to drive around it if he chose.[3]
The deputy then got out of her car and asked Schmitz where he was from. He told her "Long Beach." She asked if he needed directions, and he responded "no." She asked if he minded showing her his driver's license. As he was getting out his license, she observed that his arms were covered with abscesses — a condition which her training in street narcotics suggested was indicative of possible drug use.
The deputy then asked Schmitz if he was on probation or parole. He replied "no." She asked if anyone else in the car was on parole and was told that the male passenger in the front seat was on parole. At that point, the deputy had witnessed no violation of the law, and had observed Schmitz do nothing suspicious other than make a U-turn. At some point, apparently in response to the information that the front passenger was on parole, the deputy called for backup. As she explained it, "I already knew that somebody in that vehicle was on parole, I already knew that my safety could be jeopardized so they needed to know I'm talking to somebody on parole who can be uncooperative, wanted, unwanted, and so on."
The deputy then asked Schmitz for permission to search his vehicle. He did not answer. Thereafter, she asked all the passengers to get out of the car and conducted a search, based upon the front seat passenger's parole status. *Page 727 
The search included the entire passenger area of the car, as well as the interior of a purse belonging to the female backseat passenger. The search revealed a syringe cap located inside the purse, as well as two syringes (one without a cap) found inside a chip bag on the floor of the rear passenger area, and some methamphetamine found inside a pair of shoes — also on the floor of the rear passenger area.
Based upon that evidence, Schmitz was arrested. He then moved to suppress the evidence found in the course of the automobile search pursuant to Penal Code section 1538.5, arguing the prosecutor had the burden of justifying the validity of any search carried out in the absence of a warrant. (People v.Williams (1999) 20 Cal.4th 119, 130 [83 Cal.Rptr.2d 275,973 P.2d 521.)
In opposition to the motion, the prosecution argued the initial encounter between Schmitz and the deputy was consensual, and he was not seized or detained. The prosecutor then correctly asserted that police officers are free to ask a person for identification "without implicating the Fourth Amendment," and suggested that the presence of abscesses on Schmitz's arms was "indicative of drug use." But the prosecutor also maintained that the parole status of the front seat passenger, who exhibited "rapid speech [and] fidgety behavior," combined with the fact that both he and the backseat passenger (who was also "fidgety") admitted to past drug usage and arrests, suggested "criminal activity was afoot."[4] The prosecutor argued that once officers have "a particularized and objective basis for suspecting the person stopped of criminal activity," or "probabl[e] cause to believe an automobile contains contraband or evidence of a crime, or is itself an instrumentality of a crime, they may search the vehicle for such contraband or evidence without a search warrant."
After hearing evidence pertaining to the motion to suppress, the court denied the motion. While acknowledging the issue was a "close call," the court stated "I don't think that the officer has done anything inappropriate or anything that would negate the fact that the stop was entirely voluntary at the time and something a police individual would ask of someone who appeared to be lost and whose behavior, or conduct, or physical appearance suggested there might be a rational reason for her to conduct further investigation."
After the court denied his motion to suppress, Schmitz pleaded guilty to counts of (1) misdemeanor driving under the influence of drugs or alcohol (Veh. Code, § 23152, subd. (a)); (2) misdemeanor driving under the influence *Page 728 
of a controlled substance (Health Saf. Code, § 11550, subd. (a)); misdemeanor unauthorized possession of a hypodermic needle or syringe (Bus. Prof. Code, § 4140); and (4) misdemeanor child abuse (Pen. Code, § 273a, subd. (b)).
The court then suspended imposition of sentence, and placed Schmitz on informal probation for three years on condition he spend a total of 90 days in county jail on counts one and two. Schmitz was also ordered to pay various fines and fees, and register as a narcotics offender pursuant to Health and Safety Code section 11590.
 DISCUSSION
"The rules for review of denial of a motion to suppress are well established. This court reviews the explicit and implicit factual findings to determine if they are supported by substantial evidence. (People v. Soun (1995)34 Cal.App.4th 1499, 1507 [40 Cal.Rptr.2d 822].) We then exercise our independent judgment to determine if the facts found by the trial court establish a seizure in violation of theFourth Amendment. (Ibid.)" (People v. Hester (2004)119 Cal.App.4th 376, 385 [14 Cal.Rptr.3d 377].)
Schmitz first argues the evidence should have been suppressed as the product of his unlawful detention by the deputy. He asserts the deputy had no reasonable basis to believe any criminal activity was afoot at the time she engaged him in conversation and requested his identification, and thus that he was unreasonably "seized" in violation of the Fourth Amendment. "A seizure occurs whenever a police officer `by means of physical force or show of authority' restrains the liberty of a person to walk away." (People v. Souza (1994)9 Cal.4th 224, 229 [36 Cal.Rptr.2d 569, 885 P.2d 982], quoting Terryv. Ohio (1968) 392 U.S. 1, 19, fn. 16 [20 L.Ed.2d 889,88 S.Ct. 1868].) But Schmitz's argument simply ignores the evidence indicating the encounter, at least initially, was a consensual one.
"Unlike a detention, a consensual encounter between a police officer and an individual does not implicate theFourth Amendment. It is well established that law enforcement officers may approach someone on the street or in another public place and converse if the person is willing to do so. There is noFourth Amendment violation as long as circumstances are such that a reasonable person would feel free to leave or end the encounter." (People v. Rivera (2007) 41 Cal.4th 304,309 [59 Cal.Rptr.3d 473, 159 P.3d 60].)
Here, Schmitz's own testimony supports the inference the encounter was consensual. He admits the deputy did not block his car with hers, and he *Page 729 
testified he "could have driven on." He stated that, initially, her only words to him were an inquiry about whether he needed help. After answering "no," he "attempted" to drive away, but was thwarted when she "kept talking to me." He acknowledged that when she got out of her car, the deputy did not say anything to him "about stopping or staying there or waiting." Instead, she "asked" him for identification. At that point, by Schmitz's own description, he "put it in park; she said thank you, and I said you're welcome."
Schmitz's own testimony limns the encounter as not merely consensual, but cordial. It suggests that while he could have driven on, he would have felt rude in doing so while the deputy was still speaking to him — so he chose not to. Whatever constraint Schmitz felt appears to have been the product of his own exercise of good manners, rather than of the deputy's assertion of authority; it was not a "seizure" for purposes of the Fourth Amendment.
Of course, the consensual nature of the encounter, at least from Schmitz's perspective, changed when the deputy asked for permission to search his car. He did not give it, and his silence cannot be construed as acquiescence. A "search cannot be validated upon an implied consent based upon the failure of defendant . . . to protest the entry. . . ." (People v.Superior Court (Arketa) (1970) 10 Cal.App.3d 122, 127
[89 Cal.Rptr. 316]; see People v. Baker (2008)164 Cal.App.4th 1152, 1160 [79 Cal.Rptr.3d 858].)
The question, then, is whether the search of Schmitz's automobile can be justified — as the prosecution attempts to do in this case — on the basis that Schmitz's front seat passenger was on parole, and was thus subject to search at any time. "In California, a parolee remains in the legal custody of the Department of Corrections and Rehabilitation through the balance of his sentence and must comply with all of the terms and conditions of parole, including a search condition requiring him to submit to a search, with or without cause, at any time." (People v. Smith (2009) 172 Cal.App.4th 1354, 1361
[92 Cal.Rptr.3d 106], citing Samson v. California (2006)547 U.S. 843, 851-852 [165 L.Ed.2d 250, 126 S.Ct. 2193].)
Thus, as explained in People v. Sanders (2003)31 Cal.4th 318 [2 Cal.Rptr.3d 630, 73 P.3d 496], "[a] law enforcement officer who is aware that a suspect is on parole and subject to a search condition may act reasonably in conducting a parole search even in the absence of a particularized suspicion of criminal activity, and such a search does not violate any expectation of privacy of the parolee." (Id. at p. 333.)
But of course, the precise question raised in this case is not whether the search violated the parolee's expectation of privacy, but whether it violated that of Schmitz, the owner and driver of the car in which the parolee was *Page 730 
riding as a passenger. The prosecution here argues the search of the vehicle's passenger compartment was proper because a valid parole search may extend to areas that the parolee shares with nonparolees, over which the parolee has "`common authority.'" (People v. Smith (2002) 95 Cal.App.4th 912, 916
[116 Cal.Rptr.2d 694], quoting United States v. Matlock
(1974) 415 U.S. 164, 171 [39 L.Ed.2d 242, 94 S.Ct. 988].) However, neither Smith nor Matlock involves the search of a vehicle, despite the driver's refusal of consent, based upon the parole status of a passenger
who apparently lacks either a possessory or ownership interest therein. Thus, neither discusses whether the parolee's mere presence as a passenger in a vehicle confers upon him the requisite "common authority" to justify its search.
In United States v. Matlock, supra, 415 U.S. 164, which involved the search of a bedroom based upon consent of a woman who shared it with the defendant, the United States Supreme Court explained that the "common authority" over property which confers the power to consent to its search is founded "on mutual use of the property by persons generallyhaving joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitantshas the right to permit the inspection in his own right
and that the others have assumed the risk that one of their number might permit the common area to be searched." (Id. at p. 171, fn. 7, italics added.)
In People v. Woods (1999) 21 Cal.4th 668, 675
[88 Cal.Rptr.2d 88, 981 P.2d 1019], our own Supreme Court characterized the rule as allowing police to search an area based upon the probationary status of a person "with commonor superior authority over the area to be searched," as such authority renders "the consent of other interested parties . . . unnecessary." In the case of a probation-related search, that rule means the police may "only search those portions of the [property] they reasonably believe the probationer hascomplete or joint control over." (Id. at p. 682, italics added.)
It is well established that those who reside with either a probationer or parolee enjoy a reduced expectation of privacy in the premises they share. (People v. Sanders, supra,31 Cal.4th at p. 330; People v. Robles (2000)23 Cal.4th 789, 798-799 [97 Cal.Rptr.2d 914, 3 P.3d 311].) However, that diminution is not coextensive with the limited privacy expectations of the probationer or parolee. "Even though a person subject to a search condition has a severely diminished expectation of privacy over his or her person and property, there is no doubt that those who reside with such a person enjoy measurably greater privacy expectations in the eyes of society. For example, those who live with a probationer maintain normal expectations of privacy over their persons. In addition, they retain valid privacy expectations in residential areas subject to their exclusive access or control, so long as there is no basis for officers to reasonably believe the probationer has authority *Page 731 
over those areas. (See Illinois v. Rodriguez (1990)497 U.S. 177, 188-189 [111 L.Ed.2d 148, 110 S.Ct. 2793]; Peoplev. Woods, supra, 21 Cal.4th at p. 682.) That persons under the same roof may legitimately harbor differing expectations of privacy is consistent with the principle that one's ability to claim the protection of the Fourth Amendment depends upon the reasonableness of his or her individual expectations." (People v. Robles, supra, 23 Cal.4th at p. 798.)
Indeed, as our Supreme Court has recognized, an unduly restrictive view of the privacy expectations of those who associate with probationers or parolees might actually undermine the rehabilitative goals of those programs: "it must be remembered that probation is an `important aspect[] of the state's penal system,' the `optimum successful functioning' of which `is of compelling public interest.' [Citation.] . . . Many law-abiding citizens might choose not to open their homes to probationers if doing so were to result in the validation of arbitrary police action. If increased numbers of probationers were not welcome in homes with supportive environments, higher recidivism rates and a corresponding decrease in public safety may be expected, both of which would detract from the `optimum successful functioning' of the probation system." (People v.Robles, supra, 23 Cal.4th at p. 799.)
Unfortunately, while there are numerous cases applying this "common authority" standard to situations involving the search of residential premises shared by a parolee or probationer who is subject to a search condition, and another person who is not subject to such a condition, we have found no cases which analyze the rule in a situation involving the search of a car as opposed to a residence, or based upon the parolee status of one who is merely a visitor to the premises searched. (But seePeople v. Baker, supra, 164 Cal.App.4th 1152 [involving the search of a purse belonging to a passenger in a parolee's car]; People v. Smith, supra, 172 Cal.App.4th 1354
[involving an intrusive search of a parolee's person (which was objected to) as well as the car in which he occupied the driver's seat (which was not objected to)].)
Of course, residential searches strike at the very heart of the privacy interest protected by the Fourth Amendment.[5] "`[T]he "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."' [Citation.]" (People v. Camacho (2000) 23 Cal.4th 824, 831
[98 Cal.Rptr.2d 232, 3 P.3d 878].) By contrast, "individuals generally have a reduced expectation of privacy while driving a vehicle on public thoroughfares." (In re Arturo D.
(2002) 27 Cal.4th 60, 68 [115 Cal.Rptr.2d 581, 38 P.3d 433].) Nonetheless, those drivers do have a cognizable privacy interest in *Page 732 
their cars, which cannot be searched without legal justification. (Ibid.) The question, then, is whether Schmitz lost his legally protected privacy interest in the interior of his vehicle — the right to refuse consent to its search — simply because he allowed a parolee to ride as a passenger in the front seat. We conclude he did not.
To reiterate the rule set forth in United States v.Matlock and followed by our Supreme Court in People v.Woods, the "common authority" over property which confers the power to authorize its search is founded "on mutual use of the property by persons generally having joint accessor control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right topermit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (United States v. Matlock,supra, 415 U.S. at p. 171, fn. 7, italics added.)
In this case, there was no evidence that Schmitz, merely by allowing a parolee to ride as a passenger in his car, ceded to that parolee any authority over the car at all, let alone the authority to permit inspections of the vehicle's interior "in his own right." Indeed, there was no evidence Schmitz knew his passenger was a parolee. Had Schmitz left the vehicle in the parolee's possession, or allowed him to drive it, that would be different. (See People v.Ledesma (2006) 39 Cal.4th 641, 703 [47 Cal.Rptr.3d 326,140 P.3d 657] ["Cases from a number of jurisdictions have recognized that a guest who has the run of the house in the occupant'sabsence has the apparent authority to give consent to enter an area where a visitor normally would be received." (Italics added.)]; U.S. v. Morales (3d Cir. 1988) 861 F.2d 396,399 ["Under the Matlock test, a driver of a vehicle has the authority to consent to a search of that vehicle. As the driver, he is the person having immediate possession of and control over the vehicle."].) But Schmitz did neither. Instead, he simply allowed the parolee to visit the car temporarily as a passenger. Under those circumstances, the passenger/parolee himself would have gained no expectation of privacy in the vehicle — and thus had no basis himself to either consent or object to its search (Rakas v. Illinois (1978)439 U.S. 128 [58 L.Ed.2d 387, 99 S.Ct. 421] [holding that mere passengers, who claimed neither a possessory nor any property interest in the vehicle searched, or in the items seized from it, could not object to the search or seizure]) — while Schmitz gave up none of his own expectation of privacy, nor of his authority to prevent the officer's search of the vehicle.
Schmitz clearly had a reasonable expectation of privacy in his glove box, his console, his door pockets, his own seat, the backseat — indeed every part of his car except the front passenger seat where the parolee was sitting. The parolee, by contrast, had no expectation of privacy anywhere in the car and *Page 733 
no standing to contest his own search. Nothing Schmitz did could reasonably have been viewed as ceding authority over his backseat to the parolee. The parolee had no right to open packages, eat food, or even read magazines he found in the backseat. He could only obtain authority over the chip bag at issue here by claiming ownership, which — given his lack of search and seizure rights — would have been bootless.
Because Schmitz, as the driver, at all relevant times had possession and control of the vehicle which was searched, and his parolee/passenger never gained or exercised any apparent authority over the vehicle which might have given the police officer the reasonable impression he had the right to permit its inspection, the officer could not search the interior of the vehicle based upon the passenger's parole status. As there appears to be no other justification for the warrantless search of the vehicle's interior, the court erred in refusing to suppress the evidence obtained during that search.
The judgment against Schmitz is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.
O'Leary, J., and Moore, J., concurred.
[1] "Wert thou my enemy, O thou my friend, "How wouldst thou worse, I wonder, than thou dost "Defeat, thwart me?" (Gerard Manley Hopkins "Thou Art Indeed Just, Lord.")
[2] In accordance with well-established precedent, we must defer to the trial court's factual findings, both express and implied, in reviewing its ruling on a motion to suppress evidence. "`[T]he power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.'" (People v. Leyba (1981)29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961], quotingPeople v. Lawler (1973) 9 Cal.3d 156, 160
[107 Cal.Rptr. 13, 507 P.2d 621].)
[3] Schmitz testified that he tried to drive away after telling the deputy he did not need help, but felt unable to do so because she got out of her car and was continuing to talk to him. Although he stated "at one point she yelled stop," he never explained when that point was — other than it was "not that first instance."
[4] The alleged drug histories of Schmitz's passengers, along with their "rapid speech" and "fidgety" behavior, although cited in the prosecutor's brief, are not supported by the evidence in the record, and thus cannot be relied upon to support the search.
[5] The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures" by police officers and other government officials. (U.S. Const., 4th Amend.) *Page 734